# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | | |
|---|---|---|
| GALLAGHER-KAISER CORP., | ) | |
| | ) | Case No.: 2:14-cv-00869-GMN-DJA |
| Plaintiff, | ) | |
| | ) | **ORDER GRANTING PARTIAL** |
| vs. | ) | **SUMMARY JUDGMENT** |
| | ) | |
| LIBERTY DUCT, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Pending before the Court is the Motion for Partial Summary Judgment, (ECF No. 183), filed by Plaintiff Gallagher-Kaiser Corporation ("GK"). GK seeks partial summary judgment against Defendant Liberty Duct ("Liberty"). Liberty Duct did not file a Response, and the time to do so has passed.[1] For the reasons discussed below, the Court **GRANTS** partial summary judgment against Liberty.[2]

## I.   BACKGROUND

This action arises from a construction defect during the construction of an air traffic control tower and terminal radar approach control (the "Project") at Harry Reid International Airport, formerly known as McCarran International Airport. (Third Am. Compl. ¶ 1, ECF No. 153).[3] The Federal Aviation Administration ("FAA") contracted with Archers Western

---

[1] The deadline to respond was January 5, 2024. Liberty Duct, LLC's status is listed as "permanently revoked" on the Secretary of State's business entity search engine. At the hearing on November 29, 2023, the Court established on the record that Liberty Duct is defunct and no longer participating in this case.

[2] GK requested a hearing on this matter, (ECF No. 207). To the extent ECF No. 207 operates as a separate motion for an oral argument, that motion is DENIED. *See* D. Nev. LR 78-1 ("Parties must not file separate motions requesting a hearing."). This matter can be adjudicated without a hearing.

[3] The operative complaint in this case is currently the Fourth Amended Complaint, (ECF No. 184). GK, however, filed the instant Motion before it filed its Fourth Amended Complaint, and the Fourth Amended Complaint did not alter the claims against Liberty. Accordingly, for purposes of this Motion, the Court treats the Third Amended Complaint as the operative complaint against Liberty.

1    Contractors, LLC ("AWC") for the Project. (Watts Decl. ¶ 3, ECF No. 183-1).  AWC then

2    entered into a subcontract with GK to perform certain mechanical work, including the

3    installation of the heating, ventilation, and air conditioning ("HVAC") system. (*Id.* ¶ 4).  GK, in

4    turn, contracted with Liberty to fabricate the sheet metal duct, coat the duct with antimicrobial

5    coating, and deliver the coated duct to the Project. (*Id.* ¶ 5).  Liberty agreed to fabricate and

6    deliver all HVAC duct work and accessories per the Project plans and specification, including

7    the application of antimicrobial coatings as required. (Purchase Order 11017HVAW-10, Ex. 1

8    to Partial Mot. Summ. J., ECF No. 183-4).  It is undisputed that there was a valid offer,

9    acceptance, and consideration, and that Liberty signed the Contract.[4] (*See id.*).

10        The Contract stated that Liberty was to provide the labor, materials, equipment,

11    supervision, and accessories "per plans, specifications, and [] approved shop drawing" to

12    include "rectangular duct work . . . round duct work . . . [and] antimicrobial coating as

13    required." (*Id.* at GK-LD000548).  The Contract further incorporated the Prime Contract

14    between the FAA and AWC as well as the subcontract between AWC and GK. (*Id.* at GK-

15    LD000549 § 1.03).  Liberty guaranteed its work for a period of not less than one year from

16    acceptance of the work by the owner of the Project and agreed to make repairs to correct any

17    damage, defects, or faults which may occur during the guarantee period at no expense to either

18    GK or the owner. (*Id.* at GK-LD000555 § 13.02).  The Contract also included an

19    indemnification clause. (*Id.* § 16.01).

20        In accordance with the terms of the Contract, Liberty provided GK with a submittal for

21    the HVAC antimicrobial coating and included product literature from the manufacturer,

22    Bioshield, that was then submitted to the FAA through AWC. (Bioshield Product Information,

23    Ex. 2 to Partial Mot. Summ. J., ECF No. 183-5); (Watts Decl. ¶ 7).  The submittal described a

24    _____

25    [4] Per the Contract, "[c]ommencement of work constitute[d] acceptance of this purchase order and all terms and conditions incorporated herein." (Purchase Order 11017HVAW-10 at GK-LD000547, Ex. 1 to Partial Mot. Summ. J.).

1    "Silver Bullet AM Agion" water-based epoxy coating as a "revolutionary product" that disrupts
2    and stops the growth of microbes within an HVAC system. (Bioshield Product Information at
3    J26-0244, Ex. 2 to Partial Mot. Summ. J.).  The included literature highlighted the importance
4    of properly applying the coating to either the recommended primer or directly to "properly
5    cleaned metal." (*Id.* at J26-0248).  According to the literature, surface preparation is one of the
6    most important steps for successful application, and states that "[i]f the surface is not
7    adequately cleaned, then a future paint failure could occur." (*Id.*).

8        After the ductwork was installed, GK notified Liberty that the antimicrobial coating on a
9    portion of Liberty's ductwork was failing to adhere to the inside of the ductwork. (Watt Decl. ¶
10   9).  Liberty delivered new duct to replace the duct that was delaminating. (*Id.* ¶ 10).  Despite
11   this replacement, during start-up and testing of the mechanical systems, flaking and/or
12   delamination of the antimicrobial coating was observed. (*Id.* ¶ 11).  As a result, the FAA issued
13   Non-Conformance Report No. 50 ("NCR 50") due to defects in the antimicrobial coating.
14   (NCR 50, Ex. 3 to Partial Mot. Summ. J., ECF No. 183-6).  The flaking created a potential
15   health risk and an environmental condition that would damage the mechanical systems, as well
16   as sensitive computer and operating systems required for operating the Air Traffic Control
17   Tower. (Watt Decl. ¶ 14).  The FAA thus rejected all circular ductwork, and AWC required GK
18   to remove and replace all round ductwork. (5/19/14 FAA Letter, Ex. 4 to Partial Mot. Summ. J.,
19   ECF No. 183-7).  Remediation necessitated the removal of drywall, ceiling grid, electrical
20   work, and other previously installed materials and equipment to allow for the removal and
21   replacement of the duct. (Watt Decl. ¶ 29).

22       Bioshield's testing of the duct samples revealed evidence of a "poor or non-existent
23   surface cleaning prior to painting." (Email with Results of Testing at J26-1790, Ex. 6 to Partial
24   Mot. Summ. J., ECF No. 183-9).  GK also hired several other companies to conduct various
25   tests of the duct coating, all of which demonstrated that the presence of oil on the surface of the

duct caused poor adhesion, suggesting that the ductwork was not properly cleaned before coating. (*See, e.g.*, SME Report, Ex. 7 to Partial Mot. Summ. J., ECF No. 183-10); (RTI Laboratories Report, Ex. 8 to Partial Mot. Summ. J., ECF No. 183-11).

GK, through AWC, challenged the FAA's rejection of the duct, and an Office of Dispute Resolution for Acquisition ("ODRA") hearing was held. The administrative judge ruled that the FAA properly rejected the round and rectangular ductwork. (ODRA Decision, Ex. 14 to Partial Mot. Summ. J., ECF No. 183-17). GK, through AWC, appealed the ODRA decision as it related to the rectangular duct because, even though the rectangular duct did have inconsistent adherence testing results and test results showed the presence of oil contaminants, the rectangular duct was not flaking except at turning vanes. (Meacham Decl. ¶¶ 7–9, ECF No. 183-2). The Court of Appeals for the District of Columbia affirmed the FAA's decision, concluding that the "round ducts had oil because they had been poorly cleaned," and "[a]lthough there was less oil in the rectangular ducts, the FAA found there was enough oil in them to indicate that the problem that plagued the round duct would also plague the rectangular ducts." (USCA Opinion at 11, Ex. 15 to Partial Mot. Summ. J., ECF No. 183-18).

GK then initiated this action against Liberty. (Compl., ECF No. 1). GK later amended the Complaint to add additional defendants. (*See* Am. Compl., ECF No. 7); (Second Am. Compl., ECF No. 142); (Third Am. Compl., ECF No. 153). GK now moves for summary judgment on its claims for Breach of Contract, Breach of Warranties and Guarantees, and Express Indemnity against Liberty.[5] (Mot. Partial Summ. J., ECF No. 183).

## II.    **LEGAL STANDARD**

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant

---

[5] GK did not move for summary judgment on its claim for Negligence against Liberty.

1    is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that

2    may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

3    A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to

4    return a verdict for the nonmoving party. *Id.*  "The amount of evidence necessary to raise a

5    genuine issue of material fact is enough 'to require a jury or judge to resolve the parties'

6    differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir.

7    1983) (quoting *First Nat'l Bank v. Cities Serv. Co*., 391 U.S. 253, 288–89 (1968)).  "Summary

8    judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving

9    party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd.*

10   *P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).  A principal purpose of summary judgment is "to

11   isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477

12   U.S. 317, 323–24 (1986).

13          In determining summary judgment, a court applies a burden-shifting analysis.  "When

14   the party moving for summary judgment would bear the burden of proof at trial, it must come

15   forward with evidence which would entitle it to a directed verdict if the evidence went

16   uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing

17   the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp.*

18   *Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citation and

19   quotation marks omitted).  In contrast, when the nonmoving party bears the burden of proving

20   the claim or defense, the moving party can meet its burden in two ways: (1) by presenting

21   evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating

22   that the nonmoving party failed to make a showing sufficient to establish an element essential

23   to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477

24   U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be

25   denied, and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress*

1    *& Co.*, 398 U.S. 144, 158–60 (1970).

2        If the moving party satisfies its initial burden, the burden then shifts to the opposing

3    party to establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v.*

4    *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  But a motion for summary judgement cannot be

5    granted based solely on the fact that it is not opposed.  *See Heinemann v. Satterberg*, 731 F.3d

6    914, 917 (9th Cir. 2013); *see also* Local Rule 7-2(d).  Instead, the movant must make a showing

7    that it is entitled to judgment. *Martinez v. Stanford*, 323 F.3d 1178, 1182 (9th Cir. 2003).  In

8    assessing such a motion, courts must "ensure that the motion itself is supported by evidentiary

9    materials," *Pinder v. Employment Dev. Dept.*, 227 F. Supp. 3d 1123, 1135–36 (E.D. Cal. 2017),

10   and may only consider admissible, authenticated evidence. *Cristobal v. Siegel*, 26 F.3d 1488,

11   1494 (9th Cir. 1994).

12   **III.    DISCUSSION**

13       GK moves for summary judgment on its claims against Liberty for Breach of Contract,

14   Breach of Warranties and Guarantees, and Express Indemnification.  The Court finds that GK

15   has met its burden for summary judgment on all three claims.

16       **A.  Breach of Contract**

17       "A claim for breach of contract requires the plaintiff to demonstrate the following

18   elements: (1) the existence of a valid contract; (2) a breach by the defendant; and (3) damages

19   as a result of the breach." *Cohen-Breen v. Gray Television Grp., Inc.*, 661 F. Supp. 2d 1158,

20   1171 (D. Nev. 2009); *see also Calloway v. City of Reno*, 993 P.2d 1259, 1263 (Nev. 2000).

21   Here, GK has established that there is a valid contract between GK and Liberty, Liberty

22   breached the agreement by not properly cleaning the duct and by providing duct with coating

23   that did not properly adhere to the duct leading to its failure and rejection, and GK was

24   damaged as a result of Liberty's breach because GK had to remove and replace the non-

25   compliant duct. (*See* Purchase Order 11017HVAW-10, Ex. 1 to Partial Mot. Summ. J.); (Email

with Results of Testing at J26-1790, Ex. 6 to Partial Mot. Summ. J.); (5/19/14 FAA Letter, Ex. 4 to Partial Mot. Summ. J.).  Accordingly, GK met its initial burden on summary judgment and provided evidence establishing all elements of its breach of contract claim.  Because Liberty did not provide any evidence to rebut GK's arguments, the Court GRANTS summary judgment for GK on its breach of contract claim.

**B. Breach of Warranties and Guarantees**

"To state a breach of warranty claim under Nevada law, a plaintiff must establish three elements: (1) a warranty existed; (2) the defendant breached the warranty; and (3) the defendant's breach was the proximate cause of the plaintiff's damages." *Underwood v. O'Reilly Auto Parts, Inc.*, No. 2:21-cv-01766-GMN-NJK, 2023 WL 8378635, at *6 (D. Nev. Oct. 16, 2023).  "Express warranties may be created by an affirmation of fact that relates to the goods or a description of the goods, where the information is made part of the basis of the bargain." *Radcliff v. Amiraslanov*, 381 P.3d 653 (Nev. 2012) (citing NRS 104.2313).

Here, under Section 13.01 of the Contract, Liberty "assumed full responsibility for the furnishing and satisfactory operation of all equipment outlined and/or implied in the Specifications and Contract Documents" which includes the requirement that the microbial coating properly bond to the duct." (Purchase Order 11017HVAW-10 at GK-LD000555, Ex. 1 to Partial Mot. Summ. J.).  Liberty further warranted it would "provide a complete system which is free from defects in material and workmanship, fit and sufficient for the purpose intended in strict compliance with the specifications and other Contract Documents." (*Id.*).  Finally, Liberty warranted that all of its work under the Contract "shall be of good quality, free from faults and defects and in conformance with the Contract Documents." (*Id.*).  Liberty breached this warranty when it failed to properly install the coating so it would not delaminate from the duct, and because of this failure, GK incurred substantial damages. (Email with Results of Testing at J26-1790, Ex. 6 to Partial Mot. Summ. J.); (5/19/14 FAA Letter, Ex. 4 to

Partial Mot. Summ. J.).  Accordingly, GK met its burden on summary judgment, and Liberty

did not offer any evidence to rebut GK's claims.  The Court therefore GRANTS summary

judgment for GK on its claim for breach of warranties and guarantees.

### C. Express Indemnity

"Contractual [express] indemnity is where, pursuant to a contractual provision, two

parties agree that one party will reimburse the other party for liability resulting from the

former's work." *Medallion Dev., Inc. v. Converse Consultants*, 930 P.2d 115, 119 (Nev. 1997)

(*superseded on other grounds by statute as stated in The Doctors Co. v. Vincent*, 98 P.3d 681,

688 (Nev. 2004)).  "The scope of a contractual indemnity clause is determined by the contract

and is generally interpreted like any contract." *George L. Brown Ins. v. Star Ins. Co.*, 237 P.3d

92, 96 (Nev. 2010).  In Nevada, "a cause of action for indemnity does not arise . . . until the

party seeking indemnity has discharged a legal obligation through settlement or judgment."

*Kabins Fam. LP v. Chain Consortium*, No. 2:09-CV-01125-GMN, 2010 WL 3001890, at *7

(D. Nev. July 27, 2010).

The Contract at issue here contains an express indemnity clause.  Section 16.01 of the

Contract states, in relevant part:

> [Liberty] shall indemnify, hold harmless and defend [GK] and the Owner . . .
> from and against any and all losses, damages, expenses, claims, suits and
> demands of whatever nature, resulting from damages or injuries . . . to any
> property or persons, and any claim for losses incurred by reason of project delay,
> extended general conditions, impact costs, and other intangible injuries that might
> result from [Liberty's] late or defective performance caused by or arising out of
> any action, omission or operation under the Subcontract or in connection with the
> work attributable to [Liberty] . . . .

(Purchase Order 11017HVAW-10 at GK-LD000555, Ex. 1 to Partial Mot. Summ. J.).  As

discussed above, as a result of Liberty's defective performance, GK faced a legal obligation to

remedy the defective ductwork. (USCA Opinion, Ex. 15 to Partial Mot. Summ. J.).

Accordingly, GK met its burden on summary judgment.  Because Liberty did not offer any

evidence to rebut GK's arguments, the Court GRANTS summary judgment for GK on its Express Indemnity claim.

**IV.    <u>CONCLUSION</u>**

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, (ECF No. 183), is **GRANTED**.

**IT IS FURTHER ORDERED** that GK's Request for Hearing, (ECF No. 207), is **DENIED**.

**DATED** this __18__ day of July, 2024.

_____
Gloria M. Navarro, District Judge
United States District Court